**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GLITCH PRODUCTIONS PTY LTD, | |
| Plaintiff, | |
| v. | Case No. 24-cv-12464 |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | |
| Defendants. | |

**COMPLAINT**

Plaintiff Glitch Productions Pty Ltd ("Glitch" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

### I.      JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over Glitch's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Copyright Act 17 U.S.C. § 501, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may exercise personal jurisdiction over Defendants because Defendants structure their business activities to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers; offer shipping to the United States, including Illinois; accept payment in U.S. dollars; and, on information and belief,

sell products using infringing and counterfeit versions of Glitch's federally registered trademarks and/or unauthorized copies of Glitch's federally registered copyrighted works, including the distinctive characters embodied therein (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Glitch substantial injury in the state of Illinois.

## II.   INTRODUCTION

3.      Glitch filed this case to prevent e-commerce store operators who trade upon Glitch's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' infringing operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Glitch's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their operation. Glitch is forced to file this action to combat Defendants' counterfeiting of its registered trademarks and infringement of its registered copyrighted works, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Glitch has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks and infringement of its

copyrighted works because of Defendants' actions and therefore seeks injunctive and monetary relief.

### III.    THE PARTIES

4.    Plaintiff, Glitch Productions Pty Ltd, was formed in 2017 and is an Australian web animation studio and entertainment production and distribution company specializing in the development, production, and distribution of entertainment content.  Plaintiff has its principal place of business in Australia.

5.     Plaintiff is an indie animation studio that does it all, from pre-production to post-production, marketing to management.  Plaintiff is known for sharing fun and whimsical stories that primarily appeal to teenagers and young adults.  While lighthearted, these stories also respect the audience's ability to appreciate mature plots and complex themes.  Plaintiff is also largely recognized for its dedication to creating these stories through 3D animation, an art style not typically associated with traditional animation.  By its unique animation style and its approach to storytelling, Plaintiff has amassed over 12 million subscribers to its YouTube channel.  Plaintiff's roster of properties includes famous web series such as, Meta Runner, Sunset Paradise, SMG4, and the subjects of this action, The Amazing Digital Circus and Murder Drones.

6.    *The Amazing Digital Circus*, created by Gooseworx, follows a cast of amnesiac humans that are trapped in digital, toy-like, avatar bodies which inhabit a digital circus.  Caine, the supposed ringmaster of the digital world, thinks of random tasks, which seem menial on the surface but end up being life-threatening in the end, for the characters to do.  These tasks are designed to stimulate the casts' minds to distract them from the fact that they are forever trapped inside the digital world.  Pomni, the newest addition to the cast, struggles between finding a way to escape

and helping her fellow prisoners, who have already given up on the notion, in these dangerous tasks.

7.     The Murder Drones brand is built on an ongoing web series, created by Liam Vickers, which is set on a post-apocalyptic exoplanet called Copper 9 owned by a mining corporation.  After the core collapse of Copper 9, all biological life on the planet is wiped out. Copper 9 is then inherited by service robots that try to eke out a new civilization from the ruins of Copper 9 and killer robots that are programmed to destroy any robots not following company protocol.  The story follows Uzi, a sardonic teen helper robot gone rogue who befriends N, an excitable optimistic Murder Drone sent to destroy her.

8.     *The Amazing Digital Circus* and *Murder Drones* are two of Glitch's most popular shows. *The Amazing Digital Circus*'s pilot episode released on YouTube on October 13, 2023, which has since been watched over 350 million times. Separately, the *Murder Drones* pilot has been viewed over 55 million times and *Murder Drones* was nominated for the 2023 Webby Awards for Best Animated Video (Series & Channels). Some of the characters and character names made famous by *The Amazing Digital Circus* and *Murder Drones* include, but are not limited to:[1]

---

[1] The characters contained within the table are not an exhaustive list of the characters embodied in Glitch's copyrighted works. This table is included only to provide examples of the characters found on the infringing products offered for sale or sold by Defendants. Regardless of any changes in their design, each of these characters, among others contained within Glitch's copyrighted works, have always maintained their distinctive qualities and unique elements of expression.

| | |
|---|---|
| **Caine** |  |
| **Gangle** | |

| | | | |
|---|---|---|---|
| **Jax** | |  | |
| **Kinger** | | | |

| | | |
|---|---|---|
| **Pomni** | |  |
| **Ragatha** | | |

| | |
|---|---|
| **Zooble** |  |
| **Cyn** | |
| **J** | |



9.     Before Defendants' acts described herein, Glitch launched *The Amazing Digital Circus* and *Murder Drones* and lines of products bearing its famous THE AMAZING DIGITAL CIRCUS, ANIMATEZ, and MURDER DRONES marks.  Glitch has also registered a multitude

9

of works related to *The Amazing Digital Circus* and *Murder Drones* and the characters embodied therein with the United States Copyright Office (the "Glitch Copyrighted Works"). The registrations include but are not limited to: "The Amazing Digital Circus." (U.S. Copyright Registration No. VA0002383723), "Caine." (U.S. Copyright Registration No. VA0002383491), "Jax." (US Copyright Registration No. VA0002383501), "Pomni." (U.S. Copyright Registration No. VA0002383722), "Murder Drones logo." (U.S. Copyright Registration No. VA0002392355), "Cyn." (U.S. Copyright Registration No. VA0002392949), "J." (US Copyright Registration No. VA0002392950), "N." (U.S. Copyright Registration No. VA0002392951), "Uzi" (U.S. Copyright Registration No. VA0002392952), Gangle (U.S. Copyright Registration No.VA0002382664), Kinger (U.S. Copyright Registration No. VA0002383724), Ragatha (U.S. Copyright Registration No. VA0002383507), Zooble (U.S. Copyright Registration No. VA0002383489), and "V" (U.S. Copyright Registration No. VA0002392953).

10.     The Glitch Copyrighted Works are registered with the United States Copyright Office.  True and correct copies of the records from the U.S. Copyright Office website for the Glitch Copyrighted Works are attached hereto as **Exhibit 1**.  The Glitch Copyrighted Works embody the distinctive characters found in paragraph 8 above.

11.     Among the exclusive rights granted to Glitch under the U.S. Copyright Act are the exclusive rights to reproduce, prepare derivative works of, distribute copies of, and display the Glitch Copyrighted Works to the public. Since first publication, the Glitch Copyrighted Works have been used on Glitch's products and are featured on Glitch's official website, www.glitchproductions.store.

12.     Glitch markets and sells a variety of products, including plushies, posters, clothing, figurines, keychains, pins, vinyl records, stickers, acrylic stands, notebooks, pens, and hats (collectively, "Glitch Products").

13.     Glitch Products have become enormously popular and even iconic, driven by Glitch's quality standards and innovative designs.  Among the purchasing public, Glitch Products are instantly recognizable as such.  The Amazing Digital Circus and Murder Drones brands have become global successes and Glitch Products are among the most recognizable in the world.  Glitch Products are distributed and sold to consumers through Plaintiff's official website, www.glitchproductions.store.

14.      Glitch has continuously used the THE AMAZING DIGITAL CIRCUS, ANIMATEZ,  and MURDER DRONES trademarks, and other trademarks, and has continuously sold products under its trademarks (collectively, the "Glitch Trademarks").  As a result of this continuous use as well as the fame and popularity of *The Amazing Digital Circus* and *Murder Drones*, strong common law trademark rights have amassed in the Glitch Trademarks.  Glitch's use of the marks has also built substantial goodwill in the Glitch Trademarks.  The Glitch Trademarks are famous marks and valuable assets of Glitch.  Glitch Products typically include at least one of the Glitch Trademarks and/or Glitch Copyrighted Works.

15.     The Glitch Trademarks are registered with the United States Patent and Trademark Office, a non-exclusive list of which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
| --- | --- | --- | --- |
| 7,324,648 | THE AMAZING DIGITAL CIRCUS | Mar. 12, 2024 | For: Clothing, namely, tops, knit shirts, polo shirts, jumpers in the nature of sweaters, T-shirts, sweat shirts, blouses, blazers, sweaters, jackets, vests, coats, ponchos, dresses, skirts, trousers, pants, |

overalls, jeans, denims in the nature of pants, shorts, camisoles, lingerie, sleepwear, underwear, swim wear, gloves, ties, scarves, headscarves, shawls, Clothing belts of textile, socks, hosiery; footwear; headwear in class 025.

For: Action figure toys; Toy accessories, namely, costumes for toys; electronic multiple activity toys; modeled plastic figurines being toys; toys, namely, scale model plastic figures; toy models; plush stuffed toys; plush toys; apparatus for electronic games adapted for use with an external display screen or monitor; card games; dice games; arcade games; electronic games for the teaching of children; party games; portable gaming devices, namely, portable games with liquid crystal displays; trading cards for games; dolls; plush dolls in class 028.

For: Arranging of social entertainment events; entertainment services in the nature of an ongoing animation series; fan club services; live entertainment associated with an animation series, namely cosplay entertainment events, live music concerts, live visual and audio performances by actors; organization of social entertainment events; providing information, including online, about entertainment activities; provision of entertainment services in the nature of an animation series via an online forum; provision of non-downloadable audio and video entertainment featuring an animation series via electronic or

| | | | |
|---|---|---|---|
| | | | digital transmission; television entertainment, namely, an ongoing television programs in the field of variety; video entertainment services, namely, an animation series; live entertainment production services in the nature of production of live events for parties and special events for social entertainment purposes; production of audio entertainment, namely, audio recording; multimedia entertainment services in the nature of development, production and post-production services in the fields of video and films production of live entertainment; production of animated cartoons; production of audio and/or video recordings, other than advertising; production of webcasts, other than advertising; providing online electronic publications, not downloadable in the nature of magazines in the field of entertainment; On-line journals, namely, blogs featuring entertainment news; Online publication of journals; screenplay writing in class 041. |
| 7,324,485 | ANIMATEZ | Mar. 12, 2024 | For: Action figures; scale model kits featuring modeled plastic toy figures; scale toy figure model kits; modeled plastic figurines being toys; toy figures; toy models; plush toys; dolls in class 028. |
| 7,082,519 | MURDER DRONES | Jun. 20, 2023 | For: Clothing, namely, shorts, pants, coats, dresses, skirts and socks; footwear; headwear; t-shirts; printed t-shirts; shirts; bandanas, namely, neckerchiefs; shorts; hooded sweatshirts; jumpers, namely, pullovers; jumpers in the nature of sweaters; |

| | | | |
|---|---|---|---|
| | | | singlets; sweatbands; wristbands as clothing; hats in class 025.<br><br>For: Action toys, namely, action figure toys; children's toys, namely, stuffed toys; costumes for toys, namely, doll costumes; cuddly toys, namely, plush dolls; electronic children's multiple activity toys; molded plastic toy figurines; scale model toy figures; toy models; plastic toys, namely, toy figures; plush toys; plush stuffed toys; scale model kits; toys, namely, dolls; electronic games apparatus adapted for use with an external display screen or monitor; dice games; arcade game machines; gaming machines; games, namely, arcade game machines, action target games, board games and card games; electronic games for teaching children; party games; portable gaming devices, namely, portable video game consoles; trading cards for games; dolls; plush dolls in class 028.<br><br>For: Arranging of entertainment, namely, arranging and conducting social entertainment events; entertainment, namely, live show performances featuring video animation; fan club services for entertainment; live entertainment, namely, live audio performances by actors; live entertainment production services, namely, live audio performances by actor; organisation of competitions, namely, entertainment and educational services in the nature of competitions in the field of entertainment, education, culture, sports, and other non-business and non-commercial fields; arranging |

| | | | of contests; organisation of entertainment events in the nature of live musical performances; production of audio entertainment, namely, production of audio recordings; production of video podcasts; production of live entertainment, namely, production of television shows, plays; provision of online non-downloadable audio and video entertainment in the nature of visual and audio recordings featuring animated content via electronic or digital transmission; provision of online non-downloadable audio and video entertainment in the nature of visual and audio recordings featuring animated entertainment; television entertainment in the nature of ongoing television programs in the field of variety; video entertainment services, namely, providing a web site featuring video presentations featuring animations; providing online information in the field of entertainment; providing online videos, not downloadable, in the field of animations; film production services, other than advertising films; production of animated cartoons; providing online electronic publications, not downloadable, namely, newsletters in the field of animation entertainment; electronic publication of information on a wide range of topics, including online and over a global computer network, namely, publishing of electronic publications; publishing of electronic publications; screenplay writing; production of webcasts, other than advertising, |
|---|---|---|---|

| | | | namely, providing webcasts in the field of animation entertainment; online publication of journals or diaries consisting of weblog and blog services in the nature of online journals, namely, blogs featuring animation entertainment in class 041. |
|---|---|---|---|

16.     The U.S. registrations for the Glitch Trademarks are valid, subsisting, and in full force and effect.  The registrations for the Glitch Trademarks constitute *prima facie* evidence of their validity and of Glitch's exclusive right to use the Glitch Trademarks pursuant to 15 U.S.C. § 1057(b).  True and correct copies of the federal trademark registration certificates for the Glitch Trademarks are attached hereto as **Exhibit 2**.

17.     The Glitch Trademarks are exclusive to Glitch and are displayed extensively on Glitch Products and in marketing and promotional materials.  The Glitch Trademarks are also distinctive when applied to Glitch Products, signifying to the purchaser that the products come from Glitch and are manufactured to Glitch's quality standards.  Whether Glitch manufactures the products itself or contracts with others to do so, Glitch has ensured that its products bearing the Glitch Trademarks are manufactured to the highest quality standards.

18.     The Glitch Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned.  The innovative marketing and product designs of Glitch Products have enabled The Amazing Digital Circus and Murder Drones brands to achieve widespread recognition and fame and have made the Glitch Trademarks some of the most well-known marks in the entertainment industry.  The widespread fame, outstanding reputation, and significant goodwill associated with The Amazing Digital Circus and Murder Drones brands have made the Glitch Trademarks valuable assets of Glitch.

19.     The Glitch Trademarks have been the subject of substantial and continuous marketing and promotion by Glitch.  Glitch has marketed and promoted, and continues to market and promote, the Glitch Trademarks in the industry and to consumers through the official Glitch website www.glitchproductions.store.

20.     Glitch has expended substantial time, money, and other resources in advertising and promoting the Glitch Trademarks.  Specifically, Glitch has expended substantial resources in advertising, promoting, and marketing featuring the Glitch Trademarks.  Glitch Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs.  As a result, products bearing the Glitch Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Glitch.  Glitch Products have become among the most popular of their kind in the world.  The Glitch Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks.  As such, the goodwill associated with the Glitch Trademarks is of immeasurable value to Glitch.

21.     Glitch Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with The Amazing Digital Circus and Murder Drones brands.

22.     Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Glitch.  On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations.  Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

23. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

24. The success of The Amazing Digital Circus and Murder Drones brands has resulted in significant counterfeiting of the Glitch Trademarks and infringement of the Glitch Copyrighted Works. Because of this, Glitch has implemented a brand protection program by investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Glitch has identified many fully interactive e-commerce stores offering Unauthorized Amazon.com, Inc. ("Amazon"), WhaleCo, Inc. ("Temu"), Fruugo.com Limited ("Fruugo"), and Walmart, Inc. ("Walmart"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most infringing products now come through international mail and express courier services because of increased sales from foreign online infringers. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 3**).

25. Because the infringing products sold by offshore online infringers do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id.* When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would

have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of infringing products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of infringing goods cost the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

26. Furthermore, online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing infringers to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 4**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 5**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Infringers hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 5** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, infringers can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 5** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of [infringing products] and [infringers]." **Exhibit 4** at 186-187. Specifically, brand

owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the infringer] to reappear under a new false name and address in short order." *Id.* at p. 161.

27.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases; offer shipping to the United States, including Illinois; accept payment in U.S. dollars; and, on information and belief, sell Unauthorized Products to residents of Illinois.

28.     Defendants concurrently employ and benefit from similar advertising and marketing strategies.  For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via numerous methods, including credit cards, Amazon Pay, Payoneer, Stripe, and/or PayPal.  E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Glitch has not licensed or authorized Defendants to use any of the Glitch Trademarks and/or to copy or distribute the Glitch Copyrighted Works, and none of the Defendants are authorized retailers of Glitch Products.

29.     Many Defendants also deceive unknowing consumers by using the Glitch Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Glitch Products.  Other e-commerce stores operating under the Seller Aliases omit using the Glitch Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Glitch Products.

30.    E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

31.    E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products.  Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their operation, and to avoid being shut down.

32.    Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being unauthorized to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

33.    E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners.  Websites like

sellerdefense.cn also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Glitch, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

34.     Infringers, such as Defendants, typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Glitch's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Glitch.

35.     Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences.  Defendants, without any authorization or license from Glitch, have knowingly and willfully used, and continue to use, the Glitch Trademarks and/or copies of the Glitch Copyrighted Works in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

36.     Defendants' unauthorized use of the Glitch Trademarks and/or Glitch Copyrighted Works in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Glitch.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

37.     Glitch hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

38.     This is a trademark infringement action against certain Defendants[2] based on their unauthorized use in commerce of counterfeit imitations of the Glitch Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  The Glitch Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Glitch Products offered, sold, or marketed under the Glitch Trademarks.

39.     Certain Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the Glitch Trademarks without Glitch's permission.

40.     Glitch owns the Glitch Trademarks.  Glitch's United States registrations for the Glitch Trademarks are in full force and effect.  Upon information and belief, certain Defendants have knowledge of Glitch's rights in the Glitch Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of the Glitch Trademarks. Those Defendants' willful, intentional, and unauthorized use of the Glitch Trademarks is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

41.     Certain Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

42.     Glitch has no adequate remedy at law, and if certain Defendants' actions are not enjoined, Glitch will continue to suffer irreparable harm to its reputation and the goodwill of the Glitch Trademarks.

---

[2] Count I applies to all Defendants who infringed the Glitch Trademarks, as outlined in Schedule A attached hereto.

43.     The injuries and damages sustained by Glitch have been directly and proximately caused by certain Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

44.     Glitch hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

45.     Certain Defendants'[3] promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Glitch or the origin, sponsorship, or approval of the Unauthorized Products by Glitch.

46.     By using the Glitch Trademarks in connection with the offering for sale and/or sale of Unauthorized Products, certain Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

47.     Certain Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

48.     Glitch has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of The Amazing Digital Circus and Murder Drones brands if certain Defendants' actions are not enjoined.

---

[3] Count II applies to all Defendants who infringed the Glitch Trademarks, as outlined in Schedule A attached hereto.

**COUNT III**
**COPYRIGHT INFRINGEMENT OF UNITED STATES COPYRIGHT**
**REGISTRATIONS (17 U.S.C. §§ 106 and 501)**

49.     Glitch hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

50.     The Glitch Copyrighted Works constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*

51.     Glitch owns the Glitch Copyrighted Works.  Glitch has complied with the registration requirements of 17 U.S.C. § 411(a) for the Glitch Copyrighted Works.  The Glitch Copyrighted Works are protected by copyright registration numbers which were duly issued to Glitch by the United States Copyright Office. At all relevant times, Glitch has been, and still is, the owner of all rights, title, and interest in the Glitch Copyrighted Works, which have never been assigned, licensed, or otherwise transferred to Defendants.

52.     The Glitch Copyrighted Works are published on the internet and available to Defendants online.  As such, Defendants had access to the Glitch Copyrighted Works via the internet.

53.     Without authorization from Glitch, or any right under the law, certain Defendants[4] have deliberately copied, displayed, distributed, reproduced, and/or made derivative works incorporating the Glitch Copyrighted Works on e-commerce stores operating under the Seller Aliases and the corresponding Unauthorized Products.  Certain Defendants' derivative works are virtually identical to and/or are substantially similar to the look and feel of the Glitch Copyrighted

---

[4] Count III applies to all Defendants who infringed the Glitch Copyrighted Works, as outlined in Schedule A attached hereto.

Works.  Such conduct infringes and continues to infringe the Glitch Copyrighted Works in violation of 17 U.S.C. § 501(a) and 17 U.S.C. §§ 106(1)–(3), (5).

54.     Certain Defendants reap the benefits of the unauthorized copying and distribution of the Glitch Copyrighted Works in the form of revenue and other profits that are driven by the sale of Unauthorized Products.

55.     Certain Defendants have unlawfully appropriated Glitch's protectable expression by taking material of substance and value and creating Unauthorized Products that capture the total concept and feel of the Glitch Copyrighted Works, including the distinctive characters embodied therein.

56.     On information and belief, the certain Defendants' infringement has been willful, intentional, purposeful, and in disregard of and with indifference to Glitch's rights.

57.     Certain Defendants, by their actions, have damaged Glitch in an amount to be determined at trial.

58.     Certain Defendants' conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Glitch great and irreparable injury that cannot fully be compensated or measured in money.  Glitch has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Glitch is entitled to a preliminary and permanent injunction prohibiting further infringement of the Glitch Copyrighted Works.

## PRAYER FOR RELIEF

WHEREFORE, Glitch prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

26

a. using the Glitch Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Glitch Product or is not authorized by Glitch to be sold in connection with the Glitch Trademarks;

b. reproducing, distributing copies of, making derivative works of, or publicly displaying the Glitch Copyrighted Works in any manner without the express authorization of Glitch;

c. passing off, inducing, or enabling others to sell or pass off any products as Glitch Products or any other product produced by Glitch, that is not Glitch's or not produced under the authorization, control, or supervision of Glitch and approved by Glitch for sale under the Glitch Trademarks and/or Glitch Copyrighted Works;

d. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Glitch, or are sponsored by, approved by, or otherwise connected with Glitch;

e. further infringing the Glitch Trademarks and/or Glitch Copyrighted Works and damaging Glitch's goodwill; and

f. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Glitch, nor authorized by Glitch to be sold or offered for sale, and which bear any of the Glitch Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof and/or which bear the Glitch Copyrighted Works;

2) Entry of an Order that, upon Glitch's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms like Amazon, Temu, Fruugo, and Walmart shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Glitch Trademarks and/or Glitch Copyrighted Works;

3) That certain Defendants account for and pay to Glitch all profits realized by those Defendants by reason of those Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Glitch Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Glitch be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Glitch Trademarks;

5) As a direct and proximate result of certain Defendants' infringement of the Glitch Copyrighted Works, Glitch is entitled to damages as well as those Defendants' profits, pursuant to 17 U.S.C. § 504(b);

6) Alternatively, and at Glitch's election prior to any final judgment being entered, Glitch is entitled to the maximum amount of statutory damages provided by law, $150,000 per work infringed pursuant to 17 U.S.C. § 504(c), or for any other such amount as may be proper pursuant to 17 U.S.C. § 504(c);

7) Glitch is further entitled to recover its attorneys' fees and full costs for bringing this action pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a); and

8) Award any and all other relief that this Court deems just and proper.

Dated this 4th day of December 2024.     Respectfully submitted,

/s/ Martin F. Trainor
Martin F. Trainor
Sydney Fenton
Alexander Whang
TME Law, P.C.
10 S. Riverside Plaza
Suite 875
Chicago, Illinois 60606
708.475.1127
martin@tme-law.com
sydney@tme-law.com
alexander@tme-law.com

*Counsel for Plaintiff Glitch Productions Pty Ltd*